UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOANN GABBERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:12CV596 NCC |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§  405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Joann Gabbert's application

for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C.

§§ 401, *et seq.*, and her application for supplemental security income under Title

XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending before the

undersigned United States Magistrate Judge, with consent of the parties, pursuant

to 28 U.S.C. § 636(c).  Because the final decision is not supported by substantial

evidence on the record as a whole, the decision of the Commissioner is reversed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
As such, she is substituted for the Social Security Administration as the proper defendant in this
cause.  Fed. R. Civ. P. 25(d).

# I. Procedural History

On February 7, 2008, plaintiff Joann Gabbert filed her applications for disability insurance benefits (DIB) and supplemental security income (SSI) alleging that she became disabled on January 2, 2006, because of emphysema, chronic obstructive pulmonary disease (COPD), depression,[2] hip problems associated with osteoarthritis, and degenerative disc disease of the lower back. (Tr. 105-07, 108-14, 147.) On March 21, 2008, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 18, 19, 37-41.) Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on January 11, 2010, at which plaintiff testified. (Tr. 5-17.) On March 16, 2010, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 7-19.) After the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), plaintiff filed a civil action in this Court seeking judicial review. *See Gabbert v. Social Sec. Admin,* Cause No. 4:10CV2441 AGF (E.D. Mo. 2010). On June 6, 2011, United States District Judge Audrey G. Fleissig remanded the matter to the Commissioner on the Commissioner's motion, which represented that the Appeals

---

[2] At the hearing on January 11, 2010, plaintiff's counsel stated that plaintiff was not seeking benefits on the basis of a mental impairment. (Tr. 10.)

Council would direct the ALJ upon remand to further evaluate plaintiff's $FEV_1$ test results and determine whether plaintiff met Listing 3.02A. (*See* Tr. 684-86.)[3]

Upon receipt of Judge Fleissig's Order, the Appeals Council issued a separate Order finding the ALJ's previous hearing decision not to have adequately evaluated plaintiff's severe impairment of COPD and whether such impairment met Listing 3.02A of the Listings of Impairments. The Appeals Council therefore vacated the previous decision and remanded the matter to the ALJ[4] with specific instruction to, *inter alia*,

- Further consider whether plaintiff had an impairment that met or equaled a listed impairment;

- Obtain evidence from a medical expert, if necessary, to clarify whether plaintiff's impairment met or medically equaled the severity of a listed impairment;

- Evaluate and explain the weight given to opinion evidence obtained from treating and non-treating sources; and

- Obtain evidence from a vocational expert, if warranted, to clarify the effect of plaintiff's limitations on the occupational base, including identification of examples of appropriate jobs and the incidence of such jobs in the national economy. The ALJ was also instructed to

---

[3] The results of spirometry tests are used to determine disability under Listing 3.02A (chronic pulmonary insufficiency). In spirometry testing, $FEV_1$ stands for forced expiratory volume measured over one second. A person of plaintiff's height, that is, sixty-four inches, meets Listing 3.02A if her $FEV_1$ values are equal to or less than 1.25. 20 C.F.R. Part 404, Subpart P, Appendix I, § 3.02A, Table I.

[4] Upon the Appeals Council's remand, the matter was assigned to and heard by the same ALJ who heard and determined the matter initially. If the circumstances warrant, the Commissioner may assign the matter to another ALJ. 20 C.F.R. § 405.301.

identify and resolve conflicts, if any, between such occupational evidence and information contained in the Dictionary of Occupational Titles (DOT) and its companion publication.

(Tr. 689-91.)

Pursuant to the directive of the Appeals Council, the ALJ conducted a supplemental hearing on December 12, 2011, at which plaintiff and a vocational expert testified. (Tr. 647-80.) On March 15, 2012, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff's impairments not to meet or medically equal a listed impairment and, further, that vocational expert testimony supported a conclusion that plaintiff could perform her past relevant work as a cashier/checker, data entry worker, router, receptionist, and customer service representative. Alternatively, the ALJ found that vocational expert testimony supported a conclusion that plaintiff could perform other work as it exists in significant numbers in the national economy, such as information clerk, order taker, and mail clerk. (Tr. 692-708.) Plaintiff did not seek Appeals Council review of this decision, and the record contains no notice that the Appeals Council conducted its own review. As such, pursuant to the Notice of Decision provided to plaintiff, the ALJ's decision of March 15, 2012, became the Commissioner's final decision sixty-one days after its issuance. (Tr. 693.) This civil action seeks judicial review of this final decision. 42 U.S.C. § 405(g).

In this action, plaintiff contends that the Commissioner's final decision is

not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ failed to follow the directives set out in the Appeals Council's remand order by failing to consider the results of all of plaintiff's pulmonary function tests; by failing to consider whether plaintiff's impairments equaled a listed impairment; and by failing to obtain evidence from a medical expert for such determination. Plaintiff also claims that the ALJ erred in her determination to discount the opinion evidence obtained from plaintiff's treating physician, Dr. Vincent P. Fortunato. Finally, plaintiff argues that the ALJ erred by relying on vocational expert testimony to support her finding that plaintiff was not disabled. Plaintiff requests this Court to enter a fully favorable decision or remand the matter to the Commissioner for further consideration. For the reasons that follow, the matter will be remanded.[5]

## II. Testimonial Evidence Before the ALJ

A.   <u>Hearing Held on January 11, 2010</u>

At the hearing on January 11, 2010, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff has a high school education and received additional training in cosmetology and customer service, and as a nurse's aide. Plaintiff testified that she

_____

[5]  The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence. The recitation of

lives in a home with her son, daughter-in-law, and three-year-old grandson and that she cares for her grandson while his parents work. Plaintiff testified that she stayed for a period of time with her brother, who had cancer, until he died. (Tr. 7-8, 13.)

Plaintiff's Work History Report shows that plaintiff worked as a cashier in a store from 1993 to 1995. From 1995 to 1998, plaintiff worked as a router at Sears and with a heating and cooling company. Plaintiff also worked on an assembly line at a factory in 1998. In 2000, plaintiff worked as a receptionist at an electric company. In 2002, plaintiff worked as a data processor through a temporary employment agency. From 2003 to 2004, plaintiff worked as a checker at a grocery store. From 2003 to January 2006, plaintiff worked sporadically as a cleaner for a cleaning company, a disaster assistance employee for the Federal Emergency Management Agency, as a certified nurse's assistant at a nursing home, and as a home health care aide. (Tr. 155.)

Plaintiff testified that she has difficulty sleeping at night because of problems with her hips and legs, including neuralgia and restless leg syndrome (RLS). Plaintiff testified that she is tired during the day and has no energy but naps only twenty to thirty minutes, if at all, during the day. (Tr. 11-12.)

specific evidence in this Memorandum and Order, however, is limited to only that relating to the issues raised by plaintiff on this appeal.

As to her exertional abilities, plaintiff testified that she can sit for twenty to thirty minutes before her legs become uncomfortable. Plaintiff testified that she can stand for only five to ten minutes after which she experiences burning pain in her lower back. Plaintiff testified that she can walk for about one block after which she is out of breath. Plaintiff testified that performing almost any activity causes her to become out of breath and that she must sit and rest. Plaintiff testified that she can perform activities while sitting, such as reading, crocheting, or talking on the telephone, but that she becomes out of breath if she talks a lot. Plaintiff testified that she can lift five to ten pounds. (Tr. 14-16.)

Plaintiff testified that she does not perform many household chores but does the dishes, dusts, and "kind of pick[s] up." Plaintiff testified that she sometimes cooks. Plaintiff testified that her daughter-in-law helps with the chores. Plaintiff testified that she no longer goes to the grocery store for big trips but may go when she needs only a few things. (Tr. 13-14.) Plaintiff testified that she smokes, was trying to quit smoking, and had decreased her smoking to less than one pack of cigarettes a day. (Tr. 10-11.)

B.    Hearing Held on December 12, 2011

1.    *Plaintiff's Testimony*

At the hearing on December 12, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that she currently used an oxygen tank and had been using oxygen for over one year. Plaintiff testified that her doctor prescribed oxygen because her blood-oxygen levels were dropping. Plaintiff testified that she continues to be out of breath, even with the forced oxygen. (Tr. 660.)

Plaintiff testified that she no longer smoked, having quit smoking two months earlier in October. Plaintiff testified that her doctors repeatedly advised her to quit smoking and that she tried to quit previously, but that she had difficulty doing so because of the addiction. (Tr. 656, 661-63.)

Plaintiff testified that she suffers from atrial fibrillation which causes her heart to beat rapidly. Plaintiff testified that she takes a blood thinner to avoid having a stroke but that she continues to have a rapid heartbeat. (Tr. 663.)

Plaintiff testified that she has been unable to undergo surgery for her back condition because of her heart and lung impairments. (Tr. 661.)

As to her exertional abilities, plaintiff testified that she can sit no longer than half an hour because of pain in her legs. Plaintiff testified that she can stand for fifteen to twenty minutes. Plaintiff testified that she does no lifting except for maybe a gallon of milk, but that she has been advised to lift no more than seven pounds. Plaintiff testified that walking is the only exercise she can perform—if she exercises—and that she has been advised to exercise in water because of her back condition. Plaintiff testified that she participated in a three-mile walk for

breast cancer in 2010 but that it took hours for her to complete because she stopped and took breaks along the route.  (Tr. 656-57, 661.)

As to her daily activities, plaintiff testified that she watches television, lets the dogs in and out of the house, and uses the computer to communicate with friends.  Plaintiff testified that she helps fold laundry and sometimes cooks. Plaintiff testified that she rides in a motorized cart if she goes grocery shopping. Plaintiff testified that she stopping babysitting her grandson about one year prior when he began preschool.  (Tr. 664-65, 667.)

2.  *Testimony of Vocational Expert*

Delores Gonzales, a vocational expert, testified in response to questions posed by the ALJ and counsel.

Ms. Gonzales classified plaintiff's past work as an assembler and inspector as light and unskilled; as a grocery checker and retail cashier as light and semi-skilled; as a nurse's aide and home health aide as medium to heavy and semi-skilled; as a data entry clerk, router, receptionist, and customer service representative as sedentary and semi-skilled; as a day worker as medium and unskilled; and as a babysitter as medium and semi-skilled.  (Tr. 670-72.)

The ALJ asked Ms. Gonzales to consider an individual limited to light exertional work who should avoid fumes, odors, dust, gas, and humidity.  Ms. Gonzales testified that such a person could perform plaintiff's past relevant work

as a retail or grocery cashier, data entry clerk, router, receptionist, and customer service representative. Ms. Gonzales testified that if such individual was limited to sedentary work, she could perform plaintiff's past relevant work as a data entry clerk, router, receptionist, and customer service representative. (Tr. 672-73.)

The ALJ then asked Ms. Gonzales to consider an individual limited to light exertional work and who had the same environmental limitations, but that such individual was also limited to work that had a sit/stand option. Ms. Gonzales testified that such a person could not perform any of plaintiff's past relevant work but could perform other work in the national economy, such as information clerk, which is sedentary and unskilled and of which 16,810 such jobs exist in the State of Missouri and 1,052,120 nationally; order caller, which is light and unskilled and of which 68,140 such jobs exist in the State of Missouri and 2,815,240 nationally; and mail clerk, which is light and unskilled and of which 3,430 exist in the State of Missouri and 131,750 nationally. (Tr. 673-74.)

In response to plaintiff's counsel's questions, Ms. Gonzales testified that, since 2006, she had not worked with placing individuals in router jobs, had placed three individuals in information clerk jobs, had placed eight individuals in order caller jobs, and one individual in a mail clerk job. Ms. Gonzales testified that neither the DOT nor the Bureau of Labor and Statistics include a sit/stand option in their job descriptions. (Tr. 675-77.)

Plaintiff's counsel then asked Ms. Gonzales to assume an individual who experienced pain that frequently interfered with her attention and concentration such that she would be off task thirty-four to sixty-six percent of the time during an eight-hour workday. Ms. Gonzales testified that no jobs were available for such a person. (Tr. 677.)

### III. Relevant Medical Evidence Before the ALJ

Plaintiff visited Dr. Elena Lejano at South County Health Center on February 7, 2006, with symptoms relating to osteoporosis, respiratory abnormality, and pelvic and thigh pain. Musculoskeletal examination was unremarkable. Chest and lung examination showed decreased breath sounds in both lungs. Dr. Lejano noted plaintiff to have a long history of smoking and recommended that she quit. Plaintiff was prescribed Albuterol and was instructed to undergo spirometry pulmonary function testing (PFT). Ibuprofen was prescribed for joint pain. (Tr. 243-47.)

Bone density exams conducted on February 16, 2006, showed osteopenia within the lumbar spine but with very low risk of osteoporotic hip fracture. (Tr. 257-59.)

Spirometry PFT performed on March 3, 2006, showed plaintiff to have an $FEV_1$ value of 1.14 with no change occurring after use of a bronchodilator. These results were interpreted to show moderate obstructive airways with possible

restrictive airways that could not be determined by spirometry alone.  (Tr. 260.)

Plaintiff returned to Dr. Lejano on March 9, 2006, with complaints of chronic cough, difficulty breathing, dyspnea,[6] and joint pain.  Plaintiff reported being very active and that she lived with her grandchildren.  Plaintiff reported smoking one pack of cigarettes a day and that she no longer smoked in the house.  Plaintiff reported awareness of the health risks of smoking but stated that she was not ready to quit.  Musculoskeletal examination was unremarkable.  Chest and lung examination showed decreased breath sounds in both lung fields.  Plaintiff was diagnosed with chronic airway obstruction and was prescribed Atrovent and Albuterol.  It was also recommended that plaintiff quit smoking.  Plaintiff was also diagnosed with osteoporosis of the spine for which it was recommended that plaintiff take calcium.  Plaintiff was instructed to continue with ibuprofen for her complaints of joint pain in the pelvic and thigh region.  (Tr. 240-42.)

An x-ray of the right hip taken on March 28, 2006, yielded normal results.  (Tr. 256.)

Plaintiff returned to Dr. Lejano on April 6, 2006, for follow up and complained of back and joint pain, cough, difficulty breathing, and sputum production.  Plaintiff reported her pain to be at a level eight on a scale of one to

---

[6]  Shortness of breath.  *Stedman's Medical Dictionary* 480 (25th ed. 1990) (*Stedman's*).

ten.  Musculoskeletal examination showed slight tenderness of the LS paraspinals on the right but was otherwise unremarkable.  Plaintiff was instructed to continue with ibuprofen, and Cyclobenzaprine was prescribed for muscle spasm.  Chest and lung examination continued to show decreased breath sounds.  Plaintiff reported some improvement with Atrovent.  Plaintiff was instructed to continue with Albuterol.  (Tr. 237-39.)

On September 28, 2006, plaintiff was admitted to urgent care at St. Anthony's Medical Center with complaints of back and flank pain with shortness of breath.  Plaintiff also reported having pain with breathing.  Physical examination showed decreased breath sounds and increased wheeze.  Plaintiff's heart was noted to be in tachycardia.  A chest x-ray showed hyperinflated lungs and minimal right basilar infiltrate.  Plaintiff was administered Atrovent nebulizer and was given Albuterol, Darvocet, and Prednisone.  Plaintiff was diagnosed with pneumonia, chest wall pain, and COPD.  Plaintiff was discharged that same date and was prescribed Prednisone, Darvocet, and Bioxin.  (Tr. 205-09.)

Plaintiff returned to Dr. Lejano on October 19, 2006, and reported that her condition had not resolved since her urgent care visit.  Plaintiff currently complained of fatigue, cough, difficulty breathing but with help from inhalers, sputum production, and wheezing.  Chest and lung examination showed expiratory wheeze on the left with faint wheeze intermittently on the right.  Plaintiff was

continued on Atrovent and Albuterol for chronic airway obstruction and was advised to quit smoking. (Tr. 234-36.)

On December 7, 2006, plaintiff visited Dr. Lejano and complained of an exacerbation of back pain and reported pain upon standing and upon sitting back down. Plaintiff reported the pain to interfere with her sleep. Physical examination showed positive straight leg raising on the right and paraspinous muscle spasm about the lower lumbar area. The doctor gave plaintiff instructions about back exercises and prescribed Cyclobenzaprine and Sulindac. (Tr. 232-33.)

During a follow up examination on January 25, 2007, Dr. Lejano diagnosed plaintiff with tobacco use disorder. (Tr. 227-31.)

On April 26, 2007, plaintiff complained to Dr. Lejano that she was experiencing more shortness of breath and had increased her use of inhalers. Plaintiff reported being extremely short of breath walking up a hill and questioned whether she needed oxygen. It was noted that plaintiff smoked one pack of cigarettes a day. Plaintiff was diagnosed with tobacco use disorder and was referred for smoking cessation counseling. Plaintiff was prescribed Zyban for smoking deterrence. Dr. Lejano also noted plaintiff's chronic airway obstruction to be getting worse clinically. Plaintiff was prescribed Advair, Atrovent, and Albuterol and was referred for repeat PFTs. (Tr. 224-26.)

Spirometry PFT testing on May 18, 2007, yielded an $FEV_1$ value of 0.97.

No indication is given as to whether such value was obtained pre- or post-bronchodilator use, if a bronchodilator was used during the testing, or, if not, why a bronchodilator was not used. (Tr. 249.)

On June 28, 2007, Dr. Lejano noted plaintiff to be taking Zyban and to be using nicotine patches for smoking cessation. Plaintiff reported her breathing to be a bit better but that she experienced increased coughing. Decreased breath sounds continued to be noted in both lung fields. Plaintiff was instructed to continue with her smoking cessation plan. (Tr. 218-20.)

Plaintiff visited Dr. Christine E. Jones at South County Health Center on October 22, 2007, and reported increased hip pain and fatigue. Plaintiff reported the fatigue to be associated with coughing. Plaintiff reported having moved in with her brother to take care of him while he had cancer. Chest and lung examination was unremarkable with normal breath sounds and easy respiratory effect noted. Musculoskeletal examination was unremarkable. Plaintiff's prescription for Zyban was refilled. (Tr. 215-17.)

On November 15, 2007, plaintiff visited Dr. Jones and complained of continued back pain. Physical examination was unremarkable. Plaintiff was referred to Dr. Feldner. (Tr. 213-14.)

Plaintiff visited Dr. William Felder at the John C. Murphy Health Center on November 29, 2007, and complained of increasing low back pain over the past two

years.  Dr. Feldner noted a recent x-ray to show disc space narrowing at the L5-S1 level.  Plaintiff reported smoking less than one pack of cigarettes a day. Musculoskeletal examination showed straight leg raising to be negative, but tenderness was noted over the lumbar and sacral vertebra as well as over the sacroiliac region.  Plaintiff was diagnosed with sciatica and was instructed as to low back exercises.  (Tr. 211-12.)

Plaintiff was admitted to St. Anthony's Medical Center on January 18, 2008, with complaints of increased shortness of breath and coughing with hemoptysis.[7] It was noted that plaintiff had recently been diagnosed with pneumonia but did not fill her antibiotic prescriptions.[8]  Plaintiff's past medical history was noted to include elevated cholesterol, COPD, and emphysema.  Plaintiff reported intermittent hemoptysis with deep coughing during the past several months, with a few episodes of hemoptysis mixed with thick mucoid phlegm upon coughing during the past couple of years.  Plaintiff also reported having pleuritic-type pain in the chest and right lower back.  (Tr. 273, 282-84.)  A chest x-ray showed increased density in the right lower lobe.  (Tr. 293.)  A CT scan of the chest showed dense infiltrate of the right lung base, multiple nodular infiltrates of the left lung base and

---

[7]  The spitting of blood derived from the lungs or bronchial tubes as a result of pulmonary or bronchial hemorrhage.  *Stedman's* 701.

[8]  A separate record shows plaintiff's prescriptions not to have been filled by the pharmacy because they were not written by plan doctors.  (*See* Tr. 582.)

right middle lobe, and right perihilar infiltrate with nodular infiltrate in the right upper lobe. (Tr. 288.) An ECG showed sinus tachycardia with premature atrial complexes. (Tr. 294.) A follow up chest x-ray taken on January 22 showed resolving pneumonia, small right pleural effusion, and mild interstitial edema. (Tr. 292.) Chest x-rays taken January 24 showed borderline heart size, aortic arteriosclerosis, and mild medial right basilar infiltrate. (Tr. 290.) Plaintiff was discharged on January 24, 2008, with instructions to follow up with Dr. Ivaturi and Dr. Fortunato. Plaintiff was diagnosed with COPD, improved pneumonia, lung mass, and hyperlipidemia and was advised not to smoke. (Tr. 558.)

Plaintiff underwent a CT scan of the chest on February 6, 2008, which showed marked improvement and clearing of the bilateral lung infiltrates. COPD was noted. (Tr. 269-70.)

On February 11, 2008, plaintiff reported to Dr. Shyam Ivaturi, a pulmonologist at Intermed Medical Consultants, that she obtained some improvement and had decreased coughing. Plaintiff reported increased dyspnea with climbing stairs and doing chores. Plaintiff was prescribed Spiriva, Proair, and Advair and was instructed to stop Atrovent. Plaintiff was also instructed to stop smoking. (Tr. 342.)

Plaintiff was admitted to St. Anthony's Medical Center on February 26, 2008, with complaints of increased shortness of breath and coughing red phlegm.

Plaintiff's medications were noted to include Vytorin, Advair, Albuterol, Atrovent, Nexium, and Seroquel. Physical examination was unremarkable. Chest x-rays showed possible mass or right lower lobe infiltrate. Spirometry PFT yielded an $FEV_1$ value of 1.17, with such value increasing to 1.43 post-bronchodilator. Plaintiff was diagnosed with pneumonia, right lower lobe, abnormal CT scan, hemoptysis, and tobacco abuse. Plaintiff was advised to quit smoking, and antibiotics were given. (Tr. 264, 559.)

In a Physical Residual Functional Capacity (RFC) Assessment completed March 18, 2008, Abby Mobley with disability determinations opined that plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and had unlimited ability to push and/or pull. Ms. Mobley further opined that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl; but had no manipulative, visual, or communicative limitations. Ms. Mobley further opined that plaintiff should avoid concentrated exposure to extreme cold and heat, and even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 295-300.)

Plaintiff visited Dr. Fortunato on April 11, 2008, to establish care. Dr. Fortunato noted plaintiff to have been previously diagnosed with various ailments, including COPD and pneumonia. (Tr. 466.)

X-rays of the lumbar spine taken on April 17, 2008, in response to plaintiff's complaint of low back pain showed mild degenerative changes and mild scoliosis. (Tr. 461.)

Plaintiff was admitted to the emergency room at St. Anthony's Medical Center on May 30, 2008, with complaints of shortness of breath and productive cough with blood. Plaintiff reported that she felt she could not get enough air. Plaintiff also complained of back pain and abdominal pain. Breath sounds were decreased bilaterally. A CT angiogram of the chest showed small left base infiltrate with no new infiltrate. Pulmonary emphysema was noted. A chest x-ray showed mild left mid-lung zone discoid atelectasis.[9] Plaintiff was diagnosed with dyspnea and COPD and was discharged that same date. (Tr. 436-49.)

Plaintiff visited Dr. Fortunato on July 10, 2008, with complaints relating to heartburn and anxiety. Physical examination of the lungs was unremarkable, with no rales, rhonchi, or wheezes. Plaintiff was instructed to continue with her current medications and was instructed to quit smoking. (Tr. 467-70.)

On September 18, 2008, plaintiff reported to Dr. Ivaturi that she experienced dyspnea with climbing stairs, walking blocks, doing chores, dressing, and with coughing. Plaintiff reported occasional wheezing. Plaintiff also reported having

---

[9] Pulmonary collapse due to absence of gas from a part or the whole of the lungs. *Stedman's* 147.

pain and tightness in her chest.  It was noted that plaintiff smoked one pack of cigarettes a day.  Plaintiff's medications were noted to include Spiriva, Advair, and Ventolin.  Physical examination showed decreased breath sounds.  Plaintiff was diagnosed with moderate COPD and nicotine addiction.  Plaintiff was instructed to continue with her medications.  (Tr. 344.)

On December 3, 2008, Dr. Fortunato noted plaintiff's moderate COPD to be stable.  Plaintiff's coughing was noted to be at baseline level.  Plaintiff reported that usual activity brought on dyspnea.  Plaintiff also reported moderate and constant fatigue.  Plaintiff's medications were noted to include Advair, Spiriva, Albuterol, and Darvocet.  Examination of the lungs showed wheezes bilaterally.  Physical examination was otherwise unremarkable.  Dr. Fortunato diagnosed plaintiff with fatigue, COPD, recurrent major depression, and tobacco abuse.  Plaintiff was instructed to continue with her current medications, and Prednisone and Zithromax were prescribed.  (Tr. 471-75.)

Chest x-rays taken December 4, 2008, continued to show hyperinflated lungs but with no acute infiltrate.  (Tr. 435.)

Plaintiff returned to Dr. Ivaturi on February 2, 2009, who noted no real change.  Examination of the lungs showed few basal crackles and no wheezing.  Plaintiff was diagnosed with COPD and chronic bronchitis.  Plaintiff was instructed to continue with her current medications, and an antibiotic was

prescribed.  (Tr. 345.)

On February 19, 2009, plaintiff reported to Dr. Fortunato that her coughing had improved, although she was producing sputum at baseline.  Plaintiff reported no dyspnea at present.  Plaintiff also complained of chronic intermittent back pain with radiation to the right hip.  Plaintiff reported the pain to worsen with lifting and movement, and to be aggravated with bending.  Plaintiff reported the pain to impair her daily activities.  Musculoskeletal examination showed tenderness to palpation of the sacroiliac area but was otherwise unremarkable.  Examination of the lungs was unremarkable.  Plaintiff was diagnosed with back pain and COPD and was instructed to continue with her current medications.  Naproxen for pain and Baclofen for muscle spasm were prescribed.  Plaintiff was also referred to physical therapy.  (Tr. 476-80.)

An x-ray taken of the right hip on February 20, 2009, yielded normal results.  (Tr. 405.)  An x-ray taken of the lumbar spine that same date showed spondylosis and mild dextroscoliosis.  (Tr. 403.)  A myocardial perfusion imaging test performed March 2, 2009, in response to plaintiff's complaints of chest pain and shortness of breath yielded essentially normal results.  (Tr. 407.)  A cardiac stress test performed that same date yielded negative results, although the test was terminated after one minute because of fatigue and hip pain.  (Tr. 537.)

Plaintiff returned to Dr. Fortunato on March 5, 2009, and continued to

complain of intermittent back pain with numbness.  With respect to plaintiff's COPD, Dr. Fortunato noted plaintiff to cough and produce sputum at baseline level.  Plaintiff did not currently experience dyspnea.  Dr. Fortunato noted that Dr. Ivaturi was following plaintiff's COPD condition.  Physical examination was unremarkable.  Plaintiff was diagnosed with back pain, sciatica, RLS, and COPD. Diagnostic tests were ordered.  Plaintiff was also referred to physical therapy and to neurosurgery.  Plaintiff was prescribed Neurontin for neuralgia and Requip for RLS.  (Tr. 481-85.)

An MRI of the lumbar spine performed March 6, 2009, showed small circumferential disc bulges at the L4-5 and L5-S1 levels causing moderate narrowing of the left neural foramen at L4-5 and bilateral neural foramina at L5-S1.  (Tr. 401-02.)  A bone density test on March 30 showed plaintiff to have osteopenia at the L1-L4 levels of the lumbar spine, showing moderate risk of fracture.  Treatment was advised.  (Tr. 398, 528.)

Chest x-rays taken May 22, 2009, in response to plaintiff's complaints of chronic bronchitis and back pain showed hyperinflated lungs and mild atelectasis versus infiltrate.  (Tr. 397.)

Plaintiff returned to Dr. Fortunato on June 5, 2009, and complained of constant back pain with muscle spasm.  Plaintiff reported the pain to radiate down the left leg into the foot.  Plaintiff also reported her COPD to be getting worse,

although her cough had improved.  Finally, plaintiff reported her symptoms of RLS to be frequent and moderate, with anxiety aggravating the problem.  Physical examination was unremarkable.  Plaintiff was instructed to continue with her current medications and current therapy.  Plaintiff was prescribed DuoNeb, Cardizem, Advair, and Requip.  (Tr. 486-91.)

On June 15, 2009, plaintiff reported to Dr. Ivaturi that she had worsening dyspnea.  Plaintiff was diagnosed with COPD, chronic bronchitis, and nicotine addiction.  It was noted that plaintiff planned to quit smoking with her hospital admission.  Plaintiff was instructed to continue with her current medications and to stop smoking.  (Tr. 346.)

Spirometry PFT on June 16, 2009, yielded an $FEV_1$ value of 1.25.  Such value increased to 1.28 post-bronchodilator, with such response noted to be non-significant.  Plaintiff was diagnosed with moderate bronchial airflow obstruction, moderate restriction; and moderately decreased diffusing lung capacity.  (Tr. 390-93.)

Plaintiff visited Dr. James E. Alonso, a neurologist, on July 13, 2009, for evaluation of constant, throbbing back pain.  Plaintiff reported the pain to sometimes radiate down both legs causing numbness and tingling in the legs.  Neurologic, sensory, and coordination examinations were unremarkable.  Motor examination showed muscle strength to be 4/5 on the left and right.  Dr. Alonso

diagnosed plaintiff with back pain/paraspinal, and he prescribed Neurontin. Dr. Alonso instructed plaintiff to follow up with an orthopedic spine surgeon. (Tr. 314-15.)

Plaintiff went to the emergency room at St. Anthony's Medical Center on August 28, 2009, with complaints of shortness of breath, racing heart, and weakness. Plaintiff was admitted to the hospital whereupon it was determined that plaintiff was in atrial fibrillation. Plaintiff's history of severe COPD was noted. Chest x-rays showed hyperinflated lungs, linear scarring in the left mid-lung field laterally, and new nodular opacity in the left upper lung field. A CT scan of the chest showed mild emphysema and mild bilateral pulmonary parenchymal scarring. An ECG performed on August 29 yielded essentially normal results. An x-ray of the lumbar spine showed mild multilevel degenerative disc disease predominantly at L5-S1. During her admission, plaintiff was treated by Dr. Ivaturi, Dr. Gafford, and Dr. Fortunato. Upon discharge on September 1, 2009, plaintiff was diagnosed with new onset of atrial fibrillation, COPD, new nodule in lung without serious abnormality, ventricular tachycardia, chronic leg pain, decreased mean cell volume, and tobacco abuse. Plaintiff was told not to smoke. (Tr. 352-83.)

Plaintiff visited Dr. Luke Zebala at Washington University Orthopedics on September 15, 2009, for evaluation of her back and right leg pain. Plaintiff

reported that sitting, standing, and walking worsened her pain. Plaintiff reported being able to stand for only ten minutes and being able to walk for fifteen to thirty minutes. Plaintiff reported her pain to be at a level five at the beginning of the day and increasing to a level ten by the end of the day. Dr. Zebala noted plaintiff's medical history of COPD, atrial fibrillation, RLS, and back pain. Plaintiff's current medications were noted to include Baclofen, ibuprofen, Multaq, Diltiazem, Ventolin, Spiriva, Advair, Warfarin, and Phenytoin. Plaintiff reported smoking one pack of cigarettes a day. Physical examination showed tenderness to palpation from T12 down to the sacrum with sacral iliac joint pain. Positive straight leg raising was noted on the left. Range of motion about the hip elicited slight pain on the right. X-rays obtained that date showed moderate degenerative disc disease at L5-S1, with mild degenerative disc disease from L2-L5. Dr. Zebala noted lumbar spondylosis to be worse at L4-L5 and most severe at L5-S1 with disc collapse and a back and disc phenomenon. Facet arthrosis was also noted at these levels. Dr. Zebala also noted the results of the March 2009 MRI. Upon review of the physical exam and diagnostic testing, Dr. Zebala diagnosed plaintiff with lumbar spondylosis causing axial back pain and right L5 radiculopathy. Dr. Zebala referred plaintiff for physical therapy and advised that the best thing to do would be to quit smoking altogether. (Tr. 319-22, 901.)

On September 21, 2009, Dr. Fortunato diagnosed plaintiff with COPD, acute

sinusitis, recurrent major depression, and paresthesia[10] of the legs. Physical examination was unremarkable, but Dr. Fortunato noted plaintiff's cough to be productive and purulent. Plaintiff was prescribed Prednisone as well as medication for sinusitis and was instructed to continue her other medications. (Tr. 492-97.)

On October 15, 2009, plaintiff visited Dr. Liwa Younis at Gateway Cardiology for cardiac evaluation. Plaintiff reported having heart palpitations three to four times weekly, chest pressure and heaviness, and moderate dyspnea with exertion. Plaintiff also complained of shortness of breath and paroxysmal[11] nocturnal dyspnea. Plaintiff was diagnosed with atrial fibrillation, hypercholesterolemia, coronary artery disease, and atrial septal defect by history. A twenty-four-hour holter monitor was provided, and plaintiff's medications were adjusted. (Tr. 576-77.)

On October 23, 2009, plaintiff reported to Dr. Yousef Abduinabli at Gateway Cardiology that she experienced heart palpitations but no syncope, edema, or orthopnea. Plaintiff's medications were noted to include Coumadin, Ventolin, Spiriva, and Advair. Physical examination was unremarkable. Plaintiff was diagnosed with unspecified chest pain, atrial fibrillation, mitral regurgitation, and tobacco abuse. Plaintiff was counseled to quit smoking. (Tr. 572-74.)

---

[10] Abnormal sensation, such as burning, pricking, tickling, or tingling. *Stedman's* 1140.

[11] Sharp spasm or convulsion. *Stedman's* 1142.

Plaintiff returned to Dr. Ivaturi on October 26, 2009, and reported that she had decreased her smoking to a half-pack to one pack of cigarettes a day. Plaintiff reported dyspnea with exertion. Physical examination showed plaintiff's breathing to be unlabored with no wheezing. It was noted that plaintiff tolerated ambulating 250 feet on room air. Plaintiff was diagnosed with severe COPD, chronic bronchitis, emphysema, chronic a-fibrillation, and nicotine dependency. Plaintiff was instructed to continue on her current medications. (Tr. 347.)

Plaintiff's thirty-day holter monitor testing ended November 13, 2009, the results of which showed plaintiff to have atrial fibrillation with rapid ventricular response and symptoms that correlate with arrhythmia. It was recommended that plaintiff's medications be adjusted and that Coumadin therapy be continued. (Tr. 571.)

On December 21, 2009, Dr. Fortunato continued in his diagnoses of atrial fibrillation, COPD, and recurrent major depression. Dr. Fortunato also diagnosed plaintiff with dysesthesia (numbness) of the left leg. Laboratory testing was ordered and plaintiff was referred to Dr. Alonso in neurology. Plaintiff was instructed to continue with her current medications and to stop smoking. (Tr. 915-21.)

An MRI of the lumbar spine taken March 1, 2010, showed mild diffuse disc bulge at the L2-L3 level; diffuse disc bulge at the L4-L5 level, with disc protrusion

affecting the left foraminal zone, resulting in moderate left neural foraminal stenosis abutting the left L4 nerve root; and moderate diffuse disc bulge at the L3-L4 and L5-S1 levels, with disc protrusion noted within the left foraminal-extraforaminal zone and mild neural foraminal narrowing on the left and right. (Tr. 898-99.)

Plaintiff visited Dr. Fortunato on April 19, 2010, and complained of pain and numbness in both lower extremities, worsened by movement and walking. Plaintiff also reported choking, dyspnea, and a moderate amount of sputum with her chronic cough.  Oxygen saturation was noted to be ninety percent. Examination of the lungs showed rhonchi and wheezes, bilaterally.  Plaintiff was instructed to continue with her current medications.  Requip, Keflex, and Prednisone were prescribed.  (Tr. 922-28.)

Chest x-rays taken April 20, 2010, in response to plaintiff's complaints of dyspnea showed no acute infiltrates or pleural effusion.  (Tr. 643.)

On May 14, 2010, plaintiff complained to Dr. Fortunato that she had constant back pain with numbness and radiation to the left thigh.  Plaintiff reported having received injections at Barnes Hospital that did not work.  Plaintiff also reported worsening symptoms of acute bronchitis with asthma exacerbation. Physical examination was unremarkable.  Plaintiff was diagnosed with, *inter alia*, acute bronchitis, COPD, and back pain.  Laboratory and diagnostic testing was

ordered.  Plaintiff was instructed to continue with her current medications, and Flagyl and Bentyl were prescribed.  (Tr. 929-35.)

A CT angiogram of the chest performed May 20, 2010, in response to plaintiff's COPD and complaints of having pain while resting showed COPD changes, intraparenchymal bulla in the right upper lobe, enlarged right atrial appendage, and chronic left lower lobe infiltrate.  No evidence of pulmonary embolus was seen.  (Tr. 639-40.)

On June 8, 2010, plaintiff reported to Dr. Fortunato that her dyspnea was worsening.  Plaintiff was prescribed Flexeril for muscle spasms and Amitriptyline for neuropathy.  (Tr. 943-49.)

Plaintiff visited Dr. Ivaturi on July 14, 2010, for follow up of COPD and nicotine addiction.  It was noted that plaintiff recently had a flare of her condition after having participated in a 5K "Walk for the Cure."  Plaintiff reported waking up gasping for air and that she constantly feels tired.  Plaintiff also reported having back pain limiting her activity.  Plaintiff reported having a constant cough with production of brown sputum three times a week.  Plaintiff reported having dyspnea with bending over, doing chores, dressing, showering, climbing one flight of stairs, walking three or more blocks, walking on an incline, and carrying heavy things.  Plaintiff reported experiencing wheezing while lying down at night.  Plaintiff denied hemoptysis and edema.  It was noted that plaintiff currently smoked eight

or nine cigarettes a day and expressed a desire to quit. Physical examination was unremarkable. Plaintiff was diagnosed with severe COPD with recent exacerbation, and nicotine addiction. Dr. Ivaturi instructed plaintiff to continue with Advair, Ventolin, and Spiriva. Dr. Ivaturi also instructed plaintiff to quit smoking and stay active. (Tr. 909-11.)

Plaintiff visited Dr. Paul H. Gibson, a cardiologist, on July 27, 2010, upon referral from Dr. Fortunato. Plaintiff reported having periodic headaches, dizziness, and syncope as well as dyspnea and diaphoresis.[12] Plaintiff also reported having occasional pain in the left arm and swelling in the right leg. It was noted that plaintiff was on oxygen at night. Plaintiff reported smoking three or four cigarettes a day and that she occasionally walked for exercise. It was noted that plaintiff's activities were limited because of her occasional rapid heart rate. Plaintiff was diagnosed with chest pain, paroxysmal atrial fibrillation (PAF), and COPD. Diagnostic tests were ordered. (Tr. 1065.)

Plaintiff returned to Dr. Fortunato on August 12, 2010, with complaints of constant, radiating back pain. Plaintiff reported the pain to worsen with bending, lifting, and movement. Dr. Fortunato also noted plaintiff's moderate COPD and emphysema. Plaintiff's cough and sputum production were noted to be at baseline

---

[12] Perspiration. *Stedman's* 429.

level. Plaintiff's medications were refilled, and plaintiff was instructed to continue with her current medication regimen. (Tr. 950-57.)

On September 9, 2010, Dr. Fortunato referred plaintiff to neurology, and Requip was prescribed for RLS. (Tr. 958-965.)

Plaintiff was admitted to St. Anthony's Medical Center on September 24, 2010, with complaints of chest discomfort and tightness, shortness of breath, and pain in the left upper extremity. Plaintiff's current medications were noted to include Flexeril, Cartia, Multaq, Advair, Neurontin, Motrin, Atrovent, Prevacid, Zantac, Requip, Spiriva, and Coumadin. Physical examination showed expiratory rhonchi but was otherwise unremarkable. Chest x-rays showed hyperinflated lungs but no active cardiopulmonary disease. Plaintiff was diagnosed with COPD, atypical chest pain, and history of atrial fibrillation. (Tr. 602-20.) A transthoracic ECG performed on September 25 yielded essentially normal results; however, evidence of pulmonary hypertension was noted. (Tr. 629-31.) An exercise stress test performed that same date yielded normal results. (Tr. 621.)

Plaintiff visited Dr. Gibson on October 6, 2010, and reported being always short of breath. Plaintiff also reported occasional swelling of the left leg. Plaintiff reported that she smoked three or four cigarettes a day and walked for exercise. Plaintiff reported increased shortness of breath with any activity. Dr. Gibson noted plaintiff to have recently been placed on nocturnal oxygen. Dr. Gibson diagnosed

plaintiff with chronic shortness of breath and instructed her to continue with her current medications.  (Tr. 1064.)

On October 14, 2010, plaintiff reported no new symptoms to Dr. Fortunato. Wheezes of the right and left lungs were noted upon examination.  Plaintiff was diagnosed with COPD and hypoxemia.[13]  Prednisone was prescribed, and plaintiff was referred to Dr. Ivaturi.  It was noted that durable medical equipment had been ordered.  (Tr. 966-72.)

Plaintiff returned to Dr. Ivaturi on October 15, 2010, who noted plaintiff's recent trip to St. Anthony's as well as Dr. Fortunato's recent prescription for oxygen.  Plaintiff reported feeling a little better and that she no longer awakens with gasping, but that she continued to feel exhausted.  Plaintiff reported having a productive cough, nighttime wheezing, and chest pain in the morning with deep inhalation.  Plaintiff denied any dyspnea, hemoptysis, or edema.  Plaintiff reported being down to five cigarettes a day.  Dr. Ivaturi diagnosed plaintiff with severe COPD with recent exacerbation requiring oxygen, steroids, and antibiotics. Plaintiff was instructed to continue with her medications and oxygen therapy and to quit smoking.  (Tr. 906-08.)

Plaintiff visited Dr. Alonso on October 21, 2010, who noted plaintiff to be

---

[13]  Subnormal oxygenation of arterial blood.  *Stedman's* 756.

presently receiving injections for her back pain through a pain management physiatrist, Dr. Tang.  It was noted that plaintiff was not a surgical candidate for her back pain because of her heart and lung issues.  Dr. Alonso noted plaintiff's RLS to be well controlled with Neurontin.  Physical examination was unremarkable.  Plaintiff was instructed to continue with pain management and with Neurontin and Ropinirole (Requip).  (Tr. 914.)

In a Physical RFC Questionnaire completed November 22, 2010, Dr. Fortunato reported that he began treating plaintiff in April 2008 for severe COPD, lung mass, neuropathy, and anxiety.  Dr. Fortunato noted plaintiff's prognosis to be fair to poor.  Dr. Fortunato reported that plaintiff exhibited symptoms of dyspnea requiring oxygen, cough with sputum production, and chest pain as well as pain in the legs with neuropathy.  Dr. Fortunato reported that plaintiff's impairment was objectively seen through bilateral wheezing, "SCM usage," and decreased sensation.  Dr. Fortunato opined that plaintiff's depression and anxiety affected her physical condition.  Dr. Fortunato opined that plaintiff's pain and other symptoms would constantly interfere with her concentration on a daily basis and that plaintiff would be incapable of tolerating work stress of even low stress jobs.  Dr. Fortunato opined that plaintiff could walk less than one-quarter of a city block without rest or severe pain; could sit for fifteen minutes at a time after which she must lie down; could stand for five minutes at a time after which she must lie down; could sit for a

total of less than two hours in an eight-hour workday; and could stand and/or walk for a total of less than two hours in an eight-hour workday. Dr. Fortunato opined that plaintiff did not require a job that permits shifting positions at will between sitting, standing, or walking. Dr. Fortunato further opined that plaintiff would need to take more than ten unscheduled breaks for a period of forty-five minutes each during an eight-hour workday. Dr. Fortunato opined that plaintiff's legs should be elevated during prolonged sitting. Dr. Fortunato opined that plaintiff could rarely lift and carry less than ten pounds and should never lift and carry any amount ten pounds or greater. Dr. Fortunato opined that plaintiff could rarely twist and stoop/bend, and should never crouch, squat, or climb ladders or stairs. Dr. Fortunato estimated that plaintiff would be absent from work more than four days a month as a result of her impairments or treatment for her conditions. Dr. Fortunato reported that plaintiff experienced such limitations on account of her impairments since 2009. Dr. Fortunato noted plaintiff to also be seen by neurology and pain management services for severe leg pain. (Tr. 1077-81.)

Plaintiff was admitted to St. Anthony's Medical Center on January 8, 2011, after having fallen twice with concern that she may have passed out. An EKG upon admission showed sinus rhythm but with possible inferior wall infarct with premature atrial complexes. (Tr. 1163.) It was noted that plaintiff had multiple

complaints related to near-syncope, hyponatremia,[14] hypokalemia,[15] bronchitis,

coagulopathy, atrial fibrillation, COPD, and headaches. It was noted that plaintiff

had been unsuccessfully treated during the past year with injection therapy at

Barnes Hospital for low back pain. Plaintiff continued to complain of low back

pain with intermittent radiation to the right hip. Dr. Ravindra V. Shitut noted

plaintiff's overall medical condition to be poor, observing plaintiff to experience

dyspnea at rest and requiring oxygen. (Tr. 1168.) Chest x-rays showed

hyperinflation of the lungs but with no active disease. An x-ray of the lumbar

spine showed lumbar spondylosis and heavy aortic vascular calcification. An x-

ray of the cervical spine showed moderate C5-C6 spondylosis. An x-ray of the

right hip yielded normal results. An MRI of the lumbar spine showed disc

degeneration with narrowing at the L5-S1 disc level with broadening of the

intervertebral disc and slight facet hypertrophy without focal disc herniation.

Slight asymmetrical broadening of the intervertebral disc at the L4-L5 level was

also noted. (Tr. 1179-86.) Dr. Fortunato opined that these imaging tests showed

nothing serious or severe. Plaintiff was advised that she was not a good candidate

for back surgery given her heart and lung problems. It was recommended that

plaintiff continue with pain management through Barnes Hospital. Plaintiff was

---

[14]  Abnormally low sodium in the blood. *Stedman's* 751.

[15]  Abnormally low potassium in the blood. *Stedman's* 751.

discharged from St. Anthony's on January 19, 2011.  (Tr. 1163, 1165.)

Plaintiff returned to Dr. Fortunato on June 1, 2011, and complained of constant neuralgia of the right lower leg impairing normal activities.  Plaintiff's COPD was noted to be stable with no current dyspnea.  Lung and neurological examinations were normal.  Dr. Fortunato diagnosed plaintiff with hypertension, COPD, abnormal x-ray of lung, and dysesthesia.  Laboratory testing was ordered. (Tr. 973-80.)

Plaintiff visited Dr. Ivaturi on June 15, 2011,[16] and complained of shortness of breath while walking room to room and with climbing a flight of stairs.  Plaintiff also reported having a productive cough, wheezing, chest tightness, and edema of the right lower leg.  Plaintiff reported that she was planning a trip to Arizona and California in August and that medical arrangements had been made.  Dr. Ivaturi noted plaintiff to be an "ex-smoker" with plaintiff having quit one month prior. Plaintiff continued to be on oxygen.  Examination of the lungs showed rhonchi and wheezing in the left lung.  Physical examination showed no edema.  Plaintiff was diagnosed with severe COPD with mild flare, wheezing, and productive cough and was instructed to continue with her medications and oxygen therapy.  (Tr. 903-05.)

Plaintiff was admitted to St. Anthony's Medical Center on July 6, 2011, with

---

[16]  Plaintiff reported that transportation issues prevented her from being able to come to the office.  (Tr. 903.)

complaints of headaches, confusion, and weak legs.  Plaintiff's history of hypertension, COPD, atrial fibrillation, chronic leg pain, RLS, depression, and fibromyalgia was noted.  Plaintiff's severe tobacco abuse was also noted.  Plaintiff was intubated upon admission because of worsening respiratory failure.  A CT scan of the head showed no acute cerebral pathology and no significant change from the January 2011 CT scan.  During plaintiff's admission, chest x-rays showed interstitial changes in the right lung with no acute lung process, mild vascular redistribution, mild hyperinflation, and aortic atherosclerosis.  Plaintiff was provided medication and treatment for rapid heartbeat, low sodium, and bleeding. Plaintiff was discharged on July 11, 2011, in stable condition.  Plaintiff's diagnoses upon discharge were hyponatremia, hypertension, atrial fibrillation, COPD, tobacco abuse, chronic leg pain, and depression.  (Tr. 1107-38.)

On July 21, 2011, plaintiff reported to Dr. Fortunato that her COPD was stable with no current dyspnea.  Physical examination was unremarkable.  Plaintiff was instructed to continue with her current regimen.  (Tr. 981-88.)

Plaintiff visited Dr. Gibson on August 18, 2011, and reported having occasional headaches, constant dyspnea, and pain in the right and left legs with swelling at night.  It was noted that plaintiff had quit smoking.  Plaintiff's current medications were noted to include Gabapentin, Vitamin D, Multag, Cartia, Warfarin, Ranitidine, Prevacid, Effexor, Ropinitral, Simvastin, Baclofen,

Ibuprofen, Flexeril, Spiriva, Advair, Ventolin, and oxygen at night. Physical examination was unremarkable. Plaintiff was diagnosed with chest pain, PAF, and COPD. Plaintiff was instructed to continue with her medications. (Tr. 1062-63.)

Plaintiff visited Dr. Alonso on August 23, 2011, for evaluation of RLS, back pain, and recent onset of slight hand tremors. Plaintiff reported that her RLS was well managed with medication and that she was receiving injections for her back pain. Physical examination was unremarkable except for low amplitude tremors of the hands. Plaintiff was prescribed Requip and Neurontin and was instructed to continue with pain management. Physical therapy was considered. (Tr. 912-13.)

On September 1, 2011, plaintiff complained to Dr. Fortunato of continued neuralgia of the lower right and left legs impairing normal activities. Physical examination was unremarkable. Dr. Fortunato diagnosed plaintiff with dysesthesia, atrial fibrillation, COPD, and fibromyalgia. Laboratory and diagnostic tests were ordered. Plaintiff's prescription refills included Requip, Flexeril, Phenytoin, and Advair. (Tr. 989-97.)

Plaintiff was admitted to the emergency room at St. Anthony's Medical Center on September 13, 2011, with complaints of being dizzy for several hours and reported strange behavior. It was noted that plaintiff's family was concerned that plaintiff may be hyponatremic as before. Physical examination was unremarkable. Chest x-rays showed mildly hyperinflated lungs consistent with

COPD, but no evidence of infiltrate, effusion, or pneumothorax. A CT scan of the head yielded negative results. A MRI of the brain showed mild enlargement of the extra-axial space and minimal non-specific T2 signal prolongation in the periventricular and subcortical white matter, which Dr. Fortunato noted to be essentially negative results. Upon returning to baseline, plaintiff was discharged that same date. Plaintiff's discharge diagnosis was mental status changes, possible metabolic encephalopathy. Differential diagnoses included transient ischemic attack, seizure, and medication side effects. It was recommended that plaintiff continue with her current regimen, continue Pradaxa (an anticoagulant), and consider psychiatric consultation. (Tr. 1084-97.)

Plaintiff returned to Dr. Fortunato on September 30, 3011, and complained of worsening cough, dyspnea, and purulent sputum associated with her COPD. Plaintiff also complained of pleuritic chest pain. Examination of the lungs showed decreased breath sounds and dullness to percussion. Otherwise, physical examination was unremarkable. Chest x-rays taken that same date showed old healed granulomatous disease and hyperinflation but no acute pulmonary infiltrate. A CT angiogram of the chest showed pulmonary emphysema, new pleural-based nodular densities, patchy left lower lobe infiltrate, and scattered fibrotic changes. Plaintiff was diagnosed with COPD and pneumonia, and Toradol and Prednisone were prescribed. (Tr. 998-1006, 1031-33.)

On October 5, 2011, plaintiff underwent spirometry PFT from which she obtained an $FEV_1$ value of 1.12, increasing to 1.18 post-bronchodilator. The results of such testing were interpreted to show severe bronchial airflow obstruction with borderline reversibility. It was also noted that diffusing lung capacity was severely decreased. (Tr. 1034-37.)

On October 12, 2011, plaintiff reported to Dr. Fortunato that she had no dyspnea, cough, or sputum production. (Tr. 1007-15.)

## IV. The ALJ's Decision

In her decision rendered March 15, 2012, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 2, 2006. The ALJ found plaintiff's COPD, degenerative disc disease of the lumbar spine, and atrial fibrillation to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ determined that plaintiff had the RFC to perform light work[17] except that she must avoid any exposure to fumes, odors, dust, gases, and high humidity; and required

---

[17] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal

the option of alternating between sitting and standing at will while carrying out job duties. The ALJ determined vocational expert testimony to support a finding that plaintiff could perform her past relevant work as a cashier/checker, data entry worker, router, receptionist, and customer service representative. Alternatively, the ALJ found vocational expert testimony to support a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, information clerk, order taker, and mail clerk. The ALJ thus found plaintiff not to be under a disability from January 2, 2006, through the date of the decision. (Tr. 695-703.)

## V. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled

---

of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

"only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If so, the claimant is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If the claimant is determined able to perform such past work, she is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared

disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ;

2.  The plaintiff's vocational factors;

3.  The medical evidence from treating and consulting physicians;

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.  Any corroboration by third parties of the plaintiff's impairments; and

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the Commissioner's decision is not supported by substantial evidence on the record as a whole, and the decision must be reversed and the matter remanded to the Commissioner for further proceedings.

A.    Listing 3.02A – Chronic Pulmonary Insufficiency

To meet Listing 3.02A, plaintiff must establish that she has "[c]hronic obstructive pulmonary disease due to any cause, with the $FEV_1$ equal to or less than the values specified in Table I corresponding to the person's height without shoes." 20 C.F.R. Part 404, Subpart P, Appendix I, § 3.02A. The record shows, and the parties do not dispute, that plaintiff is sixty-four inches in height. Accordingly, to meet Listing 3.02A, plaintiff must have an $FEV_1$ value equal to or less than 1.25 obtained during pulmonary function testing. *Id.* at Table I. When determining the severity of a respiratory impairment and whether it meets the Listing, the Commissioner must use the highest $FEV_1$ value obtained. 20 C.F.R. Part 404, Subpart P, Appendix I, § 3.00E ("The highest values of the $FEV_1$ . . . , whether from the same or different tracings, should be used to assess the severity of the respiratory impairment."). The Regulations also require that "[s]pirometry should be repeated after administration of an aerosolized bronchodilator . . . if the pre-bronchodilator $FEV_1$ value is less than 70 percent of the predicted normal value." *Id.*

Here, the ALJ considered the $FEV_1$ values obtained from spirometry PFTs conducted in March 2006, February 2008, June 2009, and October 2011, specifically noting that post-bronchodilator values obtained in February 2008 and June 2009 exceeded the 1.25 value required to meet Listing 3.02A. Although the

ALJ did not consider the May 2007 FEV$_1$ value of 0.97, such failure was not error inasmuch as no indication was made that a repeat test was conducted post-bronchodilator, nor was any reason given for failure to administer a bronchodilator. *See* 20 C.F.R., Part 404, Subpart P, Appendix I, § 3.00E ("If a bronchodilator is not administered, the reason should be clearly stated in the record."). Nevertheless, because the Regulations require that the highest value be used when assessing the severity of a respiratory impairment, "whether from the same or different tracings," the ALJ did not err by using the higher FEV$_1$ readings obtained in February 2008 and June 2009 when determining whether plaintiff met Listing § 3.02A. Those readings establish that she did not.

This does not end the inquiry, however. As noted by plaintiff, the ALJ here was specifically instructed by the Appeals Council to "consider whether the claimant has an impairment that meet[s] *or equals* Listing 3.02A." (Tr. 690.) (Emphasis added.) A reading of the ALJ's decision shows that while she properly considered whether plaintiff's impairment *met* Listing 3.02A, she failed to consider whether plaintiff's impairment(s) *equaled* the Listing.[18] For this reason, the matter must be remanded for proper consideration.

If a claimant has an impairment that is described in the Listings of

---

[18] In her Brief in Support of the Answer, the Commissioner presents no argument contesting this issue. *See* Doc. #21 at p. 13.

Impairments but (a) does not exhibit one or more of the findings specified in the particular listing, or (b) exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, the impairment will be found to be medically equivalent to that listing if there are other findings related to the impairment that are at least of equal medical significance to the required criteria. 20 C.F.R. §§ 404.1526(b)(1), 416.926(b)(1). In determining whether a claimant's impairment medically equals a listed impairment, the Regulations require the Commissioner to consider all the evidence of record about the impairment(s) and its relevant effects on the claimant. 20 C.F.R. §§ 404.1526(c), 416.926(c). The Regulations also require the Commissioner to "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. §§ 404.1526(c), 416.926(c). The claimant retains the burden to prove that she meets or equals a listed impairment. *Carlson v. Astrue,* 604 F.3d 589, 593 (8th Cir. 2010) (citing *Johnson v. Barnhart,* 390 F.3d 1067, 1070 (8th Cir. 2004)).

Plaintiff's COPD is a chronic pulmonary disease that is described in the Listings of Impairments at § 3.02A. Apart from acknowledging plaintiff's $FEV_1$ values, however, the ALJ here did not address or discuss the substantial, longitudinal, and objective medical evidence of record relating to this impairment, nor the debilitating effects this impairment has upon plaintiff. Indeed, a review of the record in its entirety shows plaintiff to have repeatedly required multiple

emergency room visits and hospitalizations due to complications relating to her COPD, including shortness of breath, pneumonia, chronic bronchitis, partial collapsed lungs, and hemoptysis. The ALJ's decision is nearly devoid of any mention of this substantial evidence. To the extent the ALJ states that her earlier decision rendered March 2010 "contains a thorough summary of the medical evidence . . . through . . . 2009" (Tr. 698), a review of that decision shows the ALJ to have merely acknowledged plaintiff's diagnosis of COPD, a singular treatment for pneumonia in January 2008, and a cursory account of PFT testing, with nothing more relating to plaintiff's respiratory impairment(s). (*See* Tr. 27.) Given the lengthy record containing substantial medical evidence obtained from multiple treating physicians, including treating specialists, as well as the results of numerous diagnostic tests, the ALJ's summaries of evidence are anything but thorough. To the contrary, such summaries are cursory and demonstrate the ALJ's failure to consider the entirety of the record. Because the record does not support the ALJ's cursory conclusion, the ALJ's failure to elaborate on her conclusion is error. *Cf. Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (ALJ's detailed summary of evidence showing negative diagnostic testing and controlled symptomology with medication supported ALJ's conclusion that effects of impairment did not rise to the level of the impairment equaling a Listing); *Carlson v. Astrue*, 604 F.3d 589 (8th Cir. 2010) (ALJ specifically discussed evidence and

analyzed medical equivalence under proper legal standard).

In addition, the Regulations require the Commissioner to consider an opinion given by one or more medical consultants – as designated by the Commissioner – in determining medical equivalence. 20 C.F.R. §§ 404.1526(c), 416.926(c). No such opinion evidence appears in the record here, however. To the extent that Ms. Mobley from disability determinations completed an RFC assessment in March 2008, there is no indication in the record that Ms. Mobley was an "acceptable medical source" under the Regulations capable of providing a medical opinion. 20 C.F.R. §§ 404.1616(b), 416.1016(b); *Sloan v. Astrue*, 499 F.3d 883, 889 (8th Cir. 2007).[19] Nevertheless, even if Ms. Mobley's opinion can be considered that of a medical expert qualified to evaluate medical equivalency, *see Carlson*, 604 F.3d at 593, the undersigned notes that Ms. Mobley rendered her opinion in March 2008 and thus did not have the benefit of multiple treatment records created by plaintiff's various treating physicians, including plaintiff's primary care physician and treating neurologist, pulmonologist, and cardiologist. Nor did Ms. Mobley have the benefit of records documenting plaintiff's repeated and lengthy hospitalizations occurring subsequent to March 2008. *See McCoy v.*

---

[19] Ms. Mobley affixed her typed "signature" in the designated block for a medical consultant's signature, without any indicated title such as M.D., Ph.D., etc. Nor was a medical consultant's code included in the designated block. (Tr. 300.)

*Astrue*, 648 F.3d 605, 616 (8th Cir. 2011) (opinion of non-examining medical consultant afforded less weight when consultant did not have access to relevant medical records, including records made after date of assessment); *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001) (medical consultant's opinion not substantial evidence where consultant lacked benefit of treating physician's RFC assessment and examining physician's records). Where additional medical evidence is received that may change a medical consultant's finding regarding medical equivalence, the ALJ is required to obtain an updated medical opinion. SSR 96-6p, 1996 WL 362203 (Soc. Sec. Admin. July 2, 1996).

Accordingly, remand is necessary for further development and analysis on the issue of whether plaintiff's chronic pulmonary disease equals Listing 3.02A in medical severity. In determining medical equivalence, the ALJ shall consider all the evidence of record, including substantial evidence demonstrating repeated exacerbations and complications of plaintiff's COPD and related impairments, as well as multiple $FEV_1$ values that would otherwise place plaintiff's impairment within the Listing criteria of § 3.02A. In addition to plaintiff's COPD, the ALJ shall also consider plaintiff's other impairments in combination, including atrial fibrillation and degenerative disc disease, and determine whether the combined effects of all of plaintiff's impairments are at least of equal medical significance to those of a listed impairment. *See* 20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3).

Finally, the ALJ must obtain an updated opinion of a medical consultant in accordance with 20 C.F.R. §§ 404.1526(c), 416.926(c).

Upon remand, the ALJ is cautioned against placing undue significance on plaintiff's failure to quit smoking in the circumstances of this case. First, the undersigned notes that Listing 3.02A identifies COPD as a disabling impairment "due to any cause." In addition, as observed by the Seventh Circuit,

> Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop.

*Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). Indeed, the record shows plaintiff to have undergone significant effort to quit smoking, including the use of prescription medication for such purpose; and, as acknowledged by the Commissioner in her Brief (*see* Doc. #21 at p. 13), the plaintiff here was successful in her efforts to significantly reduce her smoking and, indeed, eventually quit.

B.      Opinion Evidence and Vocational Expert Testimony

Because the matter will be remanded to the Commissioner for a proper determination of medical equivalence, the undersigned will address plaintiff's remaining arguments only briefly.

The ALJ determined to not give substantial weight to Dr. Fortunato's

November 2010 RFC assessment, finding the assessment "not consistent with treatment notes and objective findings of the longitudinal record." (Tr. 701.) Because these cursory reasons are not supported by substantial evidence on the record as a whole, and indeed are contrary to substantial evidence, they do not constitute good reasons to discount this treating physician's opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).[20]

With respect to vocational expert testimony, the Commissioner concedes in her Brief that the ALJ mischaracterized the expert's testimony that plaintiff could perform her past relevant work with the RFC as determined by the ALJ. (*See* Doc. #21 at p. 14.) Indeed, the vocational expert testified that plaintiff could *not* perform such work. (Tr. 673.) To the extent that the ALJ alternatively found the vocational expert's testimony to support a finding that plaintiff could perform other work in the national economy, the undersigned finds such testimony to be an insufficient basis upon which to find such work to exist in *significant numbers.* 20 C.F.R. §§ 404.1566, 416.966. While the expert testified to a significant number of jobs as defined by the DOT, she acknowledged that the DOT did not include a sit/stand option for such jobs or for any other job, and that some numbers given for

---

[20] Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2011 version of the Regulations, which were in effect at the time the ALJ rendered the final decision in this cause. This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change their substance.

existing jobs did not account for a sit/stand option. (*See* Tr. 676-77.) Because the ALJ included a sit/stand option in her RFC determination, the vocational expert should have been required to provide testimony regarding the extent to which the occupational base was reduced by this limitation. *Cf. Jones*, 619 F.3d at 976-78 (noting expert testified that number of occupations would be reduced by ten to fifteen percent because of claimant's limitation to occasional handling). This is especially significant here where the only jobs described by the expert consisted of unskilled jobs. "Unskilled types of jobs are particularly structured so that a person *cannot* ordinarily sit or stand at will." SSR 83-12, 1983 WL 31253, at *4 (Soc. Sec. Admin. 1983) (emphasis added). In these circumstances, the vocational expert should clarify the implications of this "unusual limitation of ability to sit or stand" on the occupational base for unskilled work. *Id.* On the current record, it cannot be said that the vocational expert did so.

C.    New Application for SSI Benefits

Plaintiff avers that in December 2010, upon the Commissioner's first decision denying her claims for benefits, she filed a new application for SSI benefits and was awarded benefits thereon beginning January 1, 2011. (*See* Pltf.'s Brief, Doc. #14 at p. 18.) The ALJ acknowledges such circumstance in her March 2012 decision. (Tr. 695.) In the instant action for judicial review, plaintiff requests this Court to affirm the Commissioner's decision to award SSI benefits

effective January 1, 2011. The Commissioner does not address this request in her Brief. Because plaintiff's December 2010 application for benefits was not before the ALJ at the time of the hearing nor is presently before the Court for judicial review, plaintiff's request for this Court to affirm the award of benefits should be denied.

At the beginning of the supplemental hearing held on December 12, 2011, plaintiff's counsel requested the ALJ not to "take away [plaintiff's] SSI," to which the ALJ responded, "No, counsel. She has asked for this court remand, and she's got it." (Tr. 650.) The ALJ then went on to state that she would be considering and making her decision on the entire record. (*Id.*) In her Notice of Supplemental Hearing directed to plaintiff, however, the ALJ advised that the hearing concerned only plaintiff's February 2008 applications for DIB and SSI benefits. (Tr. 738.) In addition, no notice appears in the record informing plaintiff that her December 2010 application was being reopened. *See* 20 C.F.R. § 416.1492(g) ("The administrative law judge shall mail to the parties at their last known address a notice of the reopening."). Finally, the Appeals Council Order pursuant to which the ALJ conducted the supplemental hearing addresses only those issues raised in relation to the February 2008 applications previously before this Court, which were remanded for such further proceedings, and which provide the only basis for the instant action seeking judicial review. In short, there is no indication in the record

that the Commissioner reopened plaintiff's December 2010 application for benefits or that the application underwent further adjudication such that it is properly before the Court for judicial review. *See* 20 C.F.R. §§ 416.1487, 416.1488.

As such, because plaintiff's December 2010 application for SSI benefits is not before this Court for judicial review, it would be improper for the Court to "affirm" the benefits awarded as requested by plaintiff. *Cf.* 42 U.S.C. § 405(g) (judicial review is authorized only on final decisions of the Commissioner made after a hearing).

## VI. Conclusion

Therefore, for all of the foregoing reasons, the Commissioner's adverse decision is not based upon substantial evidence on the record as a whole and the cause should be remanded to the Commissioner for further consideration in accordance with this Memorandum and Order. Instead of remand for an outright award of benefits, the undersigned determines remand for further proceedings to be appropriate given the Regulations' mandate that medical expert opinion be considered in determining medical equivalence under the Listings. In addition, upon remand, the Commissioner may consider such expert opinion in determining the onset date of disability in relation to plaintiff's February 2008 applications for benefits.

Inasmuch as plaintiff's December 2010 application for SSI benefits is not

before the Court and thus is not the subject of this Memorandum and Order, the Commissioner upon remand must confine her determination to plaintiff's February 2008 applications for DIB and SSI benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


/s/ Noelle C. Collins_____
UNITED STATES MAGISTRATE JUDGE



Dated this 30th day of April 2014.